No. 14982

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

———————————

COMMONWEALTH EDISON COMPANY et al.,

Plaintiffs and Appellants,

vs.

STATE OF MONTANA et al.,

Defendants and Respondents,

and

LAKE SUPERIOR DISTRICT POWER COMPANY et al.,

Plaintiffs and Appellants,

vs.

STATE OF MONTANA et al.,

Defendants and Respondents.

———————————

Appeal from:  District Court of the First Judicial District,
Hon. Peter G. Meloy, District Court Judge

Counsel of Record:

For Appellants:

Hooks and Budewitz, Townsend, Montana
John Carl argued, Butte, Montana
Rogers and Wells, New York, N.Y.
William P. Rogers argued and William R. Glendon argued,
New York, N.Y.

For Amicus Curiae:

Garrity, Keegan and Brown, Helena, Montana
Hon. Mark White argued, Attorney General, Austin, Texas

For Respondents:

Hon, Mike Greely, Attorney General, argued, Helena, Montana
Mike McGrath argued, Assistant Attorney General and Mike
McCarter argued, Assistant Attorney General, Helena, Montana
Cannon and Gillespie, Helena, Montana
Ross Cannon argued, Helena, Montana

For Amicus Curiae:

Leo F. J. Wilking argued, Special Assistant Attorney General
for State Tax Commissioner, Bismark, North Dakota

———————————

Submitted:  April 21, 1980
Decided:  JUL 1 7 1980

Filed:

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This is an appeal from a judgment of the District Court, First Judicial District, Lewis and Clark County, Montana, the Hon. Peter G. Meloy presiding, upholding the validity of Montana's coal severance tax.

Plaintiffs sought a declaratory judgment from the District Court that the tax unconstitutionally burdens interstate commerce, and unconstitutionally frustrates federal policy. Commonwealth Edison Company and its coplaintiffs brought one action for this purpose, and Lake Superior District Power Company and its coplaintiffs brought a second action. Because the issues are the same, the actions were consolidated.

The District Court granted defendants' motions to dismiss the complaints before trial, finding as a matter of law that they did not state claims upon which relief could be granted. Judgment was entered in each case in favor of the defendants and the plaintiffs appealed.

Since each case comes to us on appeal from a judgment of dismissal, we accept the facts which are well-pleaded in the complaints as true. This was the rule before we adopted the Montana Rules of Civil Procedure, Heisler v. Severy (1945), 117 Mont. 105, 111, 158 P.2d 501, 503, and is the rule now. However, conclusions of law in the pleadings need not be accepted by this Court as binding under a judgment on a motion to dismiss. Allegations of conclusions of law present no issuable facts. Waite v. Standard Accident Insurance Co. (1957), 132 Mont. 220, 315 P.2d 984. If therefore factual issues exist which should have been considered by the District Court prior to granting judgment, the judgment

-2-

must be reversed. Conversely, if as a matter of law, under any view of the alleged facts, plaintiffs cannot prevail, affirmance of the District Court is commanded.

We have fully considered the contentions of plaintiffs on their appeal; we have examined the pleadings, and the grounds of the motion to dismiss; we have looked at the admitted factual matters which plaintiffs allege would invalidate the tax; and we have concluded from the whole record that the Montana Coal Severance Tax in its present form is a lawful exercise of Montana's taxing authority under our State and Federal Constitutions. Accordingly, we affirm the District Court.

Three issues were raised by plaintiffs for our review:

1. Is the coal severance tax impermissible under the Commerce Clause of the United States Constitution?

2. Is the coal severance tax impermissible under the Supremacy Clause of the United States Constitution as frustrating national policies and statutes?

3. Is the coal severance tax impermissible under the Supremacy Clause of the United States Constitution as frustrating national policies contained in the Mineral Lands Leasing Act of 1920?

THE TAX AND ITS HISTORY

In 1975 and 1977, the Montana Legislature amended its coal severance tax schedules, section 84-1314, R.C.M. 1947, now section 15-35-103, MCA. It now contains these provisions:

> "15-35-103. Severance tax -- rates imposed --
> exemptions. (1) A severance tax is imposed
> on each ton of coal produced in the state in
> accordance with the following schedule:

-3-

| "Heating quality (Btu per pound of coal): | Surface Mining | Underground Mining |
|---|---|---|
| "Under 7,000 | 12 cents or 20% of value | 5 cents or 3% of value |
| "7,000-8,000 | 22 cents or 30% of value | 8 cents or 4% of value |
| "8,000-9,000 | 34 cents or 30% of value | 10 cents or 4% of value |
| "Over 9,000 | 40 cents or 30% of value | 12 cents or 4% of value |

"'Value' means the contract sales price.

"(2) The formula which yields the greater amount of tax in a particular case shall be used at each point on this schedule.

"(3) A person is not liable for any severance tax upon 20,000 tons of the coal he produces in a calendar year."

No issue is raised here that there is an unconstitutional difference between the rate of taxes charged for strip-mining of coal and for underground mining of coal.

Prior to 1975, the Montana tax on strip-mined coal ranged from twelve to fourteen cents a ton, depending on BTU content. The 1975 amendment was a response to the meteoric increase in strip-mined coal entrepreneurs in the state in the 1970's. From the 1940's until the mid-1960's activity in coal strip-mining as well as in underground coal mining remained fairly dormant in the state. The increase in gross tonnage produced since 1971 from strip-mining is demonstrated by the following figures taken from the records of the Montana Department of Revenue, of which we have taken judicial notice:

| One Year | Gross Tons |
|---|---|
| 1971 | 6,983,186 |
| 1972 | 8,224,118 |
| 1973 | 10,678,058 |
| 1974 | 14,116,625 |
| 1975 | 22,160,236 |
| 1976 | 26,347,923 |
| 1977 | 27,340,905 |
| 1978 | 26,516,481 |
| 1979 | 32,545,071 |

In the general election of 1976 the Montana voters amended their state constitution by adding a new Section 5 to Article IX, 1972 Montana Constitution. In essence the constitutional addition provides that from and after December 31, 1979, at least fifty percent of the severance tax collected shall be dedicated to a trust fund, the principal of which is to remain inviolate unless appropriated by a vote of three-fourths of the members of each house of the legislature.

This Court notes in passing our impression that the 1975 coal severance tax provisions, and the 1976 constitutional amendment, were in part responses to the historical experience of Montana with respect to the inadequacy of earlier forms of taxes on mineral production. In 1965, the Hon. James Felt rose in the State House of Representatives to complain that the richest hill on earth (Butte) had paid not a dime in net proceeds tax the previous year. Some modifications in computation agreed to by the mining company ameliorated that condition in subsequent years. Nevertheless, Montana's experience had shown that its mineral wealth could be exhausted and exported with little left in Montana to make up the loss of its irreplaceable resources. Montana has been painfully educated about the extreme economic jolts that follow when the mine runs out, the oil depletes, or the timber saws come still. We have a good many examples that teach us what happens to our hills when the riches of our Treasure State are spent. For these and other reasons, when strip coal mining was beginning to burgeon, in 1975, the legislature moved to fix a tax that would provide both for the present and the future when the coal deposits were gone.

Since the commencement of the instant actions, the plaintiffs have paid their coal severance taxes under protest. Were the coal severance tax found to be invalid, presently

-5-

some $87,000,000 and accrued interest in protested taxes should have to be returned by the State to the taxpaying producers, we were informed in oral argument.

## EFFECT OF THE COMMERCE CLAUSE

Before we discuss the commerce clause contentions, we look at the relationship of the various plaintiffs to the coal tax which is being attacked. The true taxpayers before us in this case are the producers of the coal. The Montana coal severance tax is levied at the time the coal is separated by the producer from the realty in Montana, and at its value when sold by the producer in Montana. Section 15-35-103, MCA. Thus in this case, only the coal producing plaintiffs are actually paying taxes, they being Decker Coal Company, Peabody Coal Company, Westmoreland Resources, Inc., and Western Energy Company. The remaining plaintiffs are utilities to whom the producers, by contract or indirectly, may have passed on the coal severance tax as a part of the price of Montana coal. To contend that the utility plaintiffs are the true plaintiffs because by contract or indirectly they have assumed the coal severance taxes would seem also to argue that the coal producers have no real issue at stake here. Nevertheless the coal producers have the only vital stake in this case because they and not the utility companies are in fact the taxpayers. It is the producers to whom the protested taxes would be returned should the tax be found unlawful. In deciding this case therefore, we look to the status in Montana of the producing taxpayers to determine whether the coal, at the time it is severed by the producers, is subject to the present Montana state taxation.

The United States Constitution provides in Article I, Section 8, that Congress shall have the power "to regulate

-6-

Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

The principal contention of the plaintiffs in this case is that the holdings of the United States Supreme Court in Heisler, Oliver Iron Co., and Hope Gas Co., infra, no longer have any force. The plaintiffs do not allow that Montana can tax a purely local event such as the severance of coal from a seam or deposit. They insist that the commerce clause reaches even into the very severance of the coal, and that the only issue for the District Court to have decided here was whether the coal severance tax had impact enough to hamper or obstruct interstate commerce. The plaintiffs concede that the state can levy some tax, perhaps twelve and a half to fifteen percent of the value of the coal. Therefore, by inference, the plaintiffs contend that at some point not specified, between fifteen to thirty percent of the value of the coal, Montana's coal severance tax butts into the lintel of federal impermissibility.

In essence, the plaintiffs' argument under the commerce clause reduces to this: Montana has no inherent right to tax the intrastate severance of coal which may eventually enter interstate commerce except by federal sufferance; such sufferance ceases when the tax can be construed to hamper or obstruct commerce between the states.

The law on state taxation of production of goods, it seems to us, has been settled by the United States Supreme Court since the 1920's. Leading cases on manufacturing (American Mfg. Co. v. St. Louis (1919), 250 U.S. 459, 39 S.Ct. 522, 63 L.Ed. 1084); producing (Hope Gas Co. v. Hall (1927), 274 U.S. 284, 47 S.Ct. 639, 71 L.Ed. 1049); and extracting (Oliver Iron Co. v. Lord (1923), 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929); Heisler v. Thomas Colliery Co.

-7-

(1922), 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237); established a common theme: production of personal property within a state is a local activity which precedes the entry of the property into interstate commerce, and is therefore subject to state regulation and taxation.

Yet we have found no United States Supreme Court case, and none has been cited to us, which implicitly or directly overthrows the rule that the several states have the reserved power to tax intrastate manufacturing, extraction, and production of goods. It is true that some cases have used language which seems to assail this reserved power. Notwithstanding, it must be concluded after an analysis of the cases bearing on the subject that the United States Supreme Court continues to recognize the taxing power of the states in these intrastate fields.

The plaintiffs' attack against the coal severance tax under the commerce clause is based upon the premise that the United States Supreme Court has moved away from its holdings in Hope Gas Co., Oliver Iron Co., and Heisler, supra. The cases on which plaintiffs rely for this contention may be summarized as follows:

(1) Labor Board v. Jones & Laughlin (1937), 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, upholding the NLRA against a constitutional attack; Wickard v. Filburn (1942), 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122, upholding a federal program of acreage allotments for wheat production; Parker v. Brown (1943), 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, which upheld a California state statute that fixed prices and restricted sales of raisins grown in California but which contains language seeming to reject the mechanical test of Heisler; Freeman v. Hewit (1946), 329 U.S. 249, 67 S.Ct.

-8-

274, 91 L.Ed. 265, holding unconstitutional the application of an Indiana gross income tax act to the sales of securities by brokers in New York; the securities being assets of an Indiana estate, and incidentally, applying the commerce clause to intangibles as well as to tangibles; Nippert v. Richmond (1946), 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760, striking down a municipal tax on solicitors in Richmond, Virginia; Pike v. Bruce Church, Inc. (1970), 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174, striking down an Arizona state regulation concerning the packing of cantaloupes grown in Arizona; Hunt v. Washington Apple Advertising Comm'n. (1977), 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383, striking down a North Carolina statute which prescribed the labeling of containers in which apples were to be sold in that state; A. & P. Tea Co. v. Cottrell (1976), 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55, holding unconstitutional the application of a Mississippi regulation that milk and milk products could be sold in Mississippi from another state only if the other state had reciprocal provisions for Mississippi milk, where a Louisiana producer was refused a permit from Mississippi; Complete Auto Transit, Inc. v. Brady (1977), 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326, reh.den. 430 U.S. 976, which we will discuss more in detail hereafter; Washington Rev. Dept. v. Stevedoring Assn. (1978), 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682, also discussed hereafter.

Plaintiffs have cited a number of other cases, but their full recitation here would only be cumulative.

The District Court, in ruling on the motions to dismiss, determined that the cases relied on by the plaintiffs from the United States Supreme Court fell into four categories, which we here set forth together with some examples:

(1) When Congress has asserted its regulatory powers under congressional acts. Labor Board v. Jones & Laughlin, supra; Parker v. Brown, supra.

(2) When the State engages in regulatory activity of interstate commerce. Pike v. Bruce Church, Inc., supra; A. & P. Tea Co. v. Cottrell, supra.

(3) When the state imposes a tax on interstate commerce activity. Nippert v. Richmond, supra; Complete Auto Transit, Inc. v. Brady, supra.

(4) When the state imposes a tax on an activity which is not in commerce. Heisler v. Thomas Colliery Co., supra; Alaska v. Arctic Maid (1961), 366 U.S. 199, 81 S.Ct. 929, 6 L.Ed. 227.

The District Court determined that the coal severance tax in issue here fell into the fourth category. The District Court further found that the cases in the fourth category involved a local incident subject to the state's reserved power of taxation on goods which preceded their entry into interstate commerce. We agree.

It is fair judicial policy for us not to regard as controlling here dicta found in cases in which the United States Supreme Court has upheld the regulatory powers of Congress under the commerce acts. See, for example of dicta, Labor Board v. Jones & Laughlin, supra; Parker v. Brown, supra.

It is likewise fair judicial policy for us not to feel bound here by dicta found in cases involving states which have engaged in regulation of interstate commerce. Again, see Pike v. Bruce Church, Inc., supra; Philadelphia v. New Jersey (1978), 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475. Nor do we feel bound or controlled by dicta found in cases decided by the United States Supreme Court involving states

-10-

or municipalities which have imposed a tax on an interstate commerce activity. For example, Nippert v. Richmond, supra; Complete Auto Transit, Inc. v. Brady, supra. We rely instead on those cases where the United States Supreme Court has directly upheld state taxation of production, extraction or manufacturing.

While the plaintiffs have contended that the trend of the United States Supreme Court decisions has been to move away from the holdings in Heisler, Oliver Iron Co., and Hope Gas Co., supra, we do not find that contention supported in cases involving state taxes. Indeed, if we can read the trend of the decisions, it has been the policy of the Supreme Court to open up and to allow, not to prevent, state taxation of interstate commerce transactions. What has occurred in those decisions is that the Supreme Court has moved away over the course of years from the "immunity per se" rule which prevented state taxation of interstate commerce, LeLoupe v. Port of Mobile (1887), 127 U.S. 640, 8 S.Ct. 1380, 32 L.Ed. 311, to a rule of accommodation which recognizes that interstate commerce, in utilizing the services and protections of a state is required to "pay its way". See Western Live Stock v. Bureau (1938), 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823. For this reason the Supreme Court has upheld state taxation which intrudes upon interstate commerce but where there exist local incidents which justify state taxation nevertheless. General Motors v. Washington (1964), 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430; Norton Co. v. Dept. of Revenue (1951), 340 U.S. 534, 71 S.Ct. 377, 95 L.Ed. 517. Local incidents which are severable from interstate commerce but occur within a state, such that multiple taxation by other states on the same activity is not a threat, provide a basis which has brought about the standards

-11-

announced by the Supreme Court in Complete Auto Transit, Inc. v. Brady, supra, to find constitutional permissibility for state taxes on interstate commerce.

A most recent case demonstrating the tendency of the United States Supreme Court to encourage and allow state taxation of interstate commerce can be found in Exxon Corp. v. Wisconsin Dept. of Revenue (1980), ____ U.S. ____, 100 S.Ct. 2109, ____ L.Ed.2d ____. Exxon had filed income tax returns in Wisconsin using a geographical system of accounting which reflected only its Wisconsin marketing operations and which showed a loss for each year, resulting in no taxes being due. Exxon kept its accounts in three major functional departments: exploration, refining, and marketing. Transfers of products and supplies among the three functional departments were theoretically based on competitive prices. Exxon had no exploration, production or refining operations in Wisconsin in the taxable years in question. Only marketing in Wisconsin was carried on by Exxon. Nonetheless, Wisconsin treated Exxon as a unit, and apportioned its income in such manner that a tax was produced, for which Wisconsin made demand upon Exxon. The United States Supreme Court held that Wisconsin was not prevented from applying its statutory apportionment formula to appellants total income under the due process clause of the Fourteenth Amendment. It held that the unitary business principle was a proper basis for apportioning state income tax upon an interstate enterprise when its income can be reasonably related to the activities of the corporation within the taxing state. The Wisconsin tax was held valid even though its statutory apportionment formula indirectly taxed income derived from extraction or refinement of oil and gas located outside the state. The Supreme Court found nexus, proper

-12-

apportionment, and a rational relationship between the income attributed to the state and the interstate values of the enterprise. (Compare Mont. Dept. of Rev. v. Am. Smelting & Refining (1977), 173 Mont. 316, 567 P.2d 901.)

Mobile Oil Corp. v. Com'r. of Taxes of Vermont (1980), ___ U.S. ___, 100 S.Ct. 1223, 63 L.Ed. 510, likewise approved such apportionment, finding a nexus is established if the corporation avails itself of the substantial privilege of carrying on business within the state.

These recent cases buttress our statement that plaintiffs have misread the trend of the United States Supreme Court cases. That trend lies in the direction of allowing states to tax products in interstate commerce, once a nexus with the taxing state is established.

The intent and portent of the United States Supreme Court in these cases is not to overturn the holdings of Heisler, Oliver Iron Co., and Hope Gas Co., supra. Indeed the Court has consistently recognized the vitality of those holdings on production and extraction. In Freeman v. Hewit, supra, Justice Frankfurter expressed the distinction between permissible and prohibited taxes as follows:

> ". . . a seller State has various means of obtaining legitimate contribution to the cost of its government, without imposing a direct tax on interstate sales. While these permitted taxes may in an ultimate sense come out of interstate commerce, they are not, as would be a tax on gross receipts, a direct imposition on that very freedom of commercial flow which for more than 150 years has been the ward of the commerce clause." 329 U.S. at 256, 67 S.Ct. at 278, 91 L.Ed. 274.

In like manner, state taxation of manufacturing within a state has also been upheld, though manufacturing of goods destined for commerce may be thought to present a weaker case than the production or extraction of goods. Adams Mfg. Co. v. Storen (1938), 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365.

-13-

The intent of the United States Supreme Court to preserve these fields for state taxation as preliminary to interstate commerce and within the reserved taxing powers of the states is manifest. In Alaska v. Arctic Maid, supra, for example, the court found that Alaska's taxing of the gathering and freezing of fish taken from Alaska's territorial waters by ships was a "preliminary local business", to be compared with Oliver Iron Co., supra, as its "first cousin"; this, even though the ships eventually took their frozen cargo directly from the seas to the State of Washington for canning. From that evident intent of the Supreme Court, we find this portent: there is no indication by the United States Supreme Court that its historical judicial sanction of state taxation on production, extraction and manufacturing is in jeopardy.

Indeed, the very inference of such a threat in a Supreme Court opinion would have raised such a clamor that the case would be a benchmark. We find none, and can only conclude that the Supreme Court will be as consistent in this area in the future as it has been in the past.

See Federal Compress Co. v. McLean (1934), 291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622; and Chassaniol v. Greenwood (1934), 291 U.S. 584, 54 S.Ct. 541, 78 L.Ed. 1004; referred to with approval in Pike v. Bruce Church, Inc., supra. Also Caskey Baking Co. v. Virginia (1941), 313 U.S. 117, 61 S.Ct. 881, 85 L.Ed. 1223.

The importance of these reserved fields of taxation to the states cannot be overstated. The State of Texas, whose attorney general appears before us as amicus opposing Montana's tax, will realize $980 million in oil and gas production taxes this year. The State of Alaska has sufficient revenues from the severance of oil and gas within its borders that its

-14-

1980 legislature, before its recent adjournment, provided $900 million in an inviolate trust, not unlike Montana's, from those revenues. Such examples of local taxes could be added to almost state by state. No more important case on the power of states to levy taxes can be imagined than is presented here. For if the rate of tax on a local activity, as here, can be found to violate the commerce clause, then certainly the amount of tax raised by a state on a local activity is in the same jeopardy. Were we or the United States Supreme Court to reach that result, then we should see, in the words of the old spiritual that "the walls came a-tumblin' down."

Plaintiffs' attack here is another in a series that seeks to assail and overturn the recognized power of states in these regards. In Bel Oil Corporation v. Roland (1962), 242 La. 498, 137 So.2d 308, appeal dismissed 371 U.S. 2, the state court upheld the validity of a severance tax on the extraction of natural gas in Louisiana. In Industrial Uranium Co. v. State Tax Commission (1963), 95 Ariz. 130, 387 P.2d 1013, an Arizona privilege tax on mining was upheld. In Post Oak Oil Company v. Oklahoma Tax Com'n. (Okla. 1978), 575 P.2d 964, a state excise tax on the severance of natural gas in Oklahoma withstood a commerce clause attack. All of these courts relied, as we do, on the continued adherence by the United States Supreme Court to its steady course of sanction in these fields.

On the basis that the severance of coal here is a taxable event that precedes entry into interstate commerce, we rule without hesitation that plaintiffs cannot prevail on their claims under count I of their complaints, because Montana's coal severance tax does not violate the commerce clause. The severance of coal by mining is not an interstate activity.

-15-

In oral argument, the plaintiffs asked us to give them a straight up-and-down decision on whether the coal severance tax was governed by the commerce clause. We have done that in the foregoing paragraphs. However, we feel compelled to remark that even if the commerce clause in this case obtained, plaintiffs could not have prevailed and the motion dismissing the complaints would have been properly granted in any event.

In making their commerce clause argument, the plaintiffs have contended that we were bound to apply the tests set forth in Complete Auto Transit, Inc., supra. In that case, the United States Supreme Court considered the constitutionality of a Mississippi tax on the "privilege of doing business in that state". The earlier case of Spector Motor Service v. O'Connor (1951), 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573, had adopted a formalistic test to the effect that taxes on the "privilege" of doing interstate business violated the commerce clause. The United States Supreme Court in Complete Auto Transit, Inc. overruled Spector stating that state taxes affecting interstate commerce must be viewed as to their practical effect and must be examined in light of a four-pronged test of that practical effect:

(1) Whether the tax is applied to an activity with a substantial nexus with the taxing state,

(2) Whether it is fairly apportioned,

(3) Whether the tax does not discriminate against interstate commerce and,

(4) Whether the tax is fairly related to the services provided by the state. 430 U.S. at 277-8, 97 S.Ct. at 1078, 51 L.Ed.2d at 330.

Washington Rev. Dept. v. Stevedoring Assn., supra,

-16-

upheld this four-pronged test and further recognized that a state had a significant interest in exacting from interstate commerce its fair share of the cost of state government. 435 U.S. at 748, 98 S.Ct. at 1398, 55 L.Ed.2d at 695.

Complete Auto Transit, Inc. is a good example of our earlier assertion that the United States Supreme Court, instead of intruding upon the reserved fields of taxation allowed the state on local activities, has been moving toward a permissive or accomodating position allowing state taxation of interstate commerce under certain conditions.

Applying the Complete Auto Transit, Inc. four-pronged test, for the sake of argument, to the case at bar, plaintiffs could not prevail as a matter of law. Surely there can be no argument here that a substantial, in fact, the only nexus of the severance of coal is established in Montana. There can be no discussion of apportionment, because the severance can occur in no other state. There is no danger of multiple taxation, for no other state can tax the severance. See, Chassaniol, supra; compare, Mich.-Wis. Pipeline Co. v. Calvert (1954), 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583.

There would remain, if Complete Auto Transit, Inc. applied, only the fourth test, whether the tax is fairly related to the services provided by the state.

The taxpayers here, the coal producers, have the right to and the availability of all the governmental comforts and protection which this state provides. Since the United States Supreme Court is tending toward the position that interstate commerce must pay its way in the respective states affected thereby, it is with logic of great force that Montana can require strip-coal mining to assume its just share for the cost of the state government that it

-17-

enjoys, and for the governmental cost that has occurred, is now occurring, and will in the future occur as the direct result of such strip-coal mining. Here Montana meets the test set out in General Motors v. Washington, supra, 377 U.S. at 441, 84 S.Ct. at 1568, 12 L.Ed.2d at 435:

> "For our purposes the decisive issue turns on the operating incidents of the tax. In other words, the question is whether the State has exerted its power in proper proportion to appellant's activities within the state and to appellant's consequent enjoyment of the opportunities and protections which the State has afforded. . ."

It is impossible for any court to foot up the dollar cost of the governmental benefits received and to be received by the taxpayers here. Aptly the state points out the heart of plaintiffs' complaint is the rate of the tax. The state further contends that no United States Supreme Court opinion invalidating a state levy has turned on the rate of a tax. No summation of the cost of governmental benefits has ever been required by any court in determining the validity of a rate of levy in a general excise, property or income tax imposed by a state. It is said:

> "A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes . . .. Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve the abandonment of the most fundamental principle of government--that it exists primarily to provide for the public good." Carmichael v. Southern Coal Co. (1937), 301 U.S. 495, 522-523, 57 S.Ct. 868, 878-879, 81 L.Ed. 1245, 1260-1261.

The rate of a tax is a determination for the legislature to make, not a court. Montana's legislature has determined that its coal severance tax is fairly related to the governmental services Montana provides, and to the benefits of a trained

-18-

work force and the advantages of a civilized society. See, Japan Line, Ltd. v. County of Los Angeles (1979), 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336; Washington Rev. Dept. v. Stevedoring Assn., supra. We are not talking here about "user" charges or like fees imposed for the use of state facilities where the charge for the service must bear some fair relation to the service or property provided for use. Such "user" charges are capable of being determined. See Evansville Airport v. Delta Airlines (1972), 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620. Taxes as here imposed for the general support of the government are fairly related to that purpose by the mere fact that a government is thereby maintained. It is only when the taxpayer has an insufficient nexus to the taxing state, or the tax is disproportionate to the incidents of commerce being taxed, that the fair-relation test applies. See, e.g. National Bellas Hess, Inc. v. Dept. of Revenue (1967), 386 U.S. 753, 756, 758, 87 S.Ct. 1389, 18 L.Ed.2d 505.

Complete Auto Transit, Inc., is intended to apply to situations where a state or local taxing authority adopts a tax that intrudes upon, hampers or obstructs in some fashion interstate commerce. It has no application in this case to the intrastate severance of coal by mining. But even if Complete Auto Transit, Inc. applied, as we have shown, plaintiffs could not prevail here as a matter of law.

We note that a tax of thirty percent of the coal's value at the time of its severance is not any indication of the impact of the severance tax as to the cost of coal at its final destination, in-state or out-of-state. The attorney general of Texas, appearing here as amicus, informed us in oral argument that Montana coal destined for Texas is now

-19-

purchased at $7 per ton at the mine, resulting in a severance tax in Montana of $2.10 per ton; however, the coal at destination in Texas costs $30 per ton. Most of the added price comes from the cost of transportation of the coal to Texas, which costs, the attorney general informed us, have increased from $8 per ton to $20 per ton in a short time. Demonstrably therefore, as to Texas, the interstate impact of the Montana coal severance tax is no greater than that of federal and state taxes on gasoline at the pump (before the recent price increases) or the state and city sales taxes on goods and services found in most localities. On the same tack, when we consider the customers of the utilities who are appearing in this case, it is obvious without argument or proof that coal costs are only a portion of total generating costs of electricity. Although plaintiffs have contended that Montana's coal tax is passed on to the utility consumers, it must be admitted that this is because of the particular terms of the coal contracts of purchase entered into by the utility-plaintiffs. It would be strange indeed if the legality of a tax could be made to depend on the vagaries of the terms of contracts. We do not assume that in the broad picture all of the Montana coal tax is passed on to consumers because Montana does not have a monopoly in the production of coal. Montana coal must compete in the market with coal produced in Wyoming, North Dakota, and other sources of supply. Under those circumstances, economic factors will determine whether the producers will shoulder all or part of the tax, or pass it on in the form of increased prices.

The argument therefore that Montana is "exporting its coal tax" to out-of-state users has no more force in reality

-20-

when applied to Montana coal than to any other type of lawful tax on goods or products eventually moving in interstate commerce. Certainly, taxes paid on goods and products from origin to the eventual consumer are a factor in the final price to the consumer; that is an economic fact of our lives. In that sense, every state or locality that levies a tax on goods or products originating therein or manufactured therein is exporting its tax. No sane rule of law can or should be developed that would make a local tax illegal solely because it is a factor in the cost the eventual consumer pays. Such a rule would make state government taxation of goods and products a judicial morass.

It is for these reasons that we have determined, as we have stated earlier, to look at the status of the true taxpayers in this case, the producers of the coal. The Montana severance tax is levied at the time the coal is separated by the producer from the realty in Montana at its value when sold in Montana. In that light we have no difficulty in finding that Montana has the power as a state to tax the severance of coal within its borders. Plaintiffs contended in oral argument that because the coal bought by the utilities from the producers was already under contract for sale when mined, that the instant the coal was severed, it was in interstate commerce. We do not have to address that argument because the taxable event, as far as Montana is concerned is the act of severance itself. The event of severance necessarily precedes the instant when the coal ceases to be part of the realty and becomes part of the mass of personalty in Montana. We are not required here to determine whether the mined coal should not be considered a part of interstate commerce until the moment when the producer hands the coal over to the buyer, or its transporter

-21-

for the account of the buyer. There is no need to concern ourselves with such fine points here. The severance itself is a taxable event and the Montana statutes here tax that event in advance of any entry of the coal into commerce. In other words, the coal is produced and that production is taxed. Montana's coal severance tax is therefore ahead of and preliminary to the sweep of the power of Congress to regulate commerce. If this be not so, Montana and all other states would have to concede that any power of a state to tax the production of products which may eventually enter into interstate commerce is at the whim or forbearance of the federal government. Neither the United States Supreme Court nor any other court has so held, and well enough, for such a decision would shatter the shield of judicially-approved states' rights in this field.

When it is realized that the coal producing plaintiffs are the real and only taxpayers of the Montana tax, the "exported tax" theory falls. With it falls the notion that there is no political check on the Montana legislature to limit the tax. Experience shows the producer plaintiffs are a vigorous presence at any session of the Montana legislature. Records of the Montana Secretary of State, of which we take judicial notice, Rule 202(b), M.R.Evid., show the number of lobbyists registered for the coal industry in recent sessions, sections 5-7-103 and 5-7-201, MCA, and their participation before legislative committees on matters affecting the coal industry.

Finally, with respect to the commerce clause, plaintiffs have continued to assert an argument which does not raise a substantive issue or one material to our decision in this case, but nonetheless requires a comment lest our silence be considered an admission of its substance.

-22-

The nonissue raised by plaintiffs is that since a good deal of the coal being mined by plaintiffs or potentially to be mined (in oral argument it was said 75% of the coal) underlies federal leases, this coal therefore is not Montana's "birthright" but belongs to the nation as a whole. The argument is intended to have us believe that Montana is taxing here not the coal producers, but the people of the United States themselves.

Montana, in common with many of the states, has a substantial portion of its surface area under federal ownership. In addition, the federal government reserved to itself coal and other minerals in many of its patents or deeds of grant. We assume this situation gives rise to the nonissue raised by the plaintiffs.

Plaintiffs' argument is addressed to emotion and not to law. As long as the federal coal remains in deposit under federal ownership, it is "our" coal in the sense that it belongs to the people through the federal government. Once mined under a federal lease or permit, title to the coal is vested as personal property in the lessee or permittee as soon as it is mined and removed from its original place, subject only to the royalty rights of the lessor, Olson v. Pedersen (1975), 194 Neb. 159, 231 N.W.2d 310, the same as with oil and gas. De Mik v. Cargill (Okla. 1971), 485 P.2d 229. Montana may impose taxes on the private lessees of federal lands. 30 U.S.C. §189; Oklahoma Tax Comm'n. v. Texas Co. (1949), 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721; reh.den. (1949), 336 U.S. 958, 69 S.Ct. 887, 93 L.Ed. 1111.

The coal being taxed here therefore is not "our" coal, but the personal property of the plaintiffs who produced it under lease or permit. When the coal is mined, the federal government is in no different position as a lessor than a private lessor who grants a mining lease or permit.

-23-

## THE SUPREMACY CLAUSE

"This [federal] Constitution and the Laws of the
United States which shall be made in Pursuance thereof",
states U.S. CONST. Art. VI, Cl. 2, ". . . shall be the
supreme Law of the Land . . .."

Here plaintiffs contend that Montana's coal severance
tax is preempted because it "frustrates and impairs" im-
plementation of federal policy; that the District Court
misconceived the national policies involved here; that the
overall national energy policy is to encourage a greatly
expanded production and use of western coal; and that the
question of substantial frustration is one of fact which
cannot be determined on the pleadings.

Montana responds that the plaintiffs have failed to
allege or to identify any "Laws of the United States" which
the coal severance tax could frustrate or impair; and that
the general policy considerations and goals alleged by
plaintiffs are not "laws of the United States" which are
declared to be the "supreme Law of the Land".

The motion to dismiss made by the State in the District
Court challenged the legal sufficiency of the supremacy
clause claim of the plaintiffs.

It is conceded by the plaintiffs that Congress has not
expressly preempted or limited the authority of the State to
levy the coal severance tax, nor "clearly and unmistakably"
required the conclusion that Congress intended to prohibit
or limit the tax. Rather the plaintiffs contend, as their
complaints allege:

> "32. That the coal severance tax, on
> its face, and as applied, substantially frustrates
> and impairs fulfillment of national policies and
> purposes of certain acts of Congress." (App. 27)

-24-

Under this argument plaintiffs contend that proof of "substantial frustration" does not require plaintiffs to show a specific Congressional intent to preempt the field (Pl. Brief at 60).

In fine, plaintiffs have contended that it is not the tax, but the rate of the tax which constitutes an obstacle to federal policy and which requires a determination of fact as to whether such obstacle exists.

By their argument, plaintiffs seek to bring themselves within the coverage of statements made by the United States Supreme Court in Ray v. Atlantic Richfield Co. (1978), 435 U.S. 151, 158, 98 S.Ct. 988, 55 L.Ed.2d 179; Jones v. Rath Packing Company (1977), 430 U.S. 519, 525-526, 97 S.Ct. 1305, 51 L.Ed.2d 604; reh.den. (1977), 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240; De Canas v. Bica (1976), 424 U.S. 351, 357 n. 5, 96 S.Ct. 933, 47 L.Ed.2d 43; and Perez v. Campbell (1971), 402 U.S. 637, 652, 91 S.Ct. 1704, 29 L.Ed.2d 233. Plaintiffs claim to be inheritors of the decision in M'Culloch v. Maryland (1819), 17 U.S. 415 (4 Wheat. 316), 4 L.Ed. 579.

In making its determination on the preemption issue, the District Court examined the following acts of Congress submitted or cited to the District Court as acts which defined the federal policies in the field:

Powerplant and Industrial Fuel Use Act of 1978 Pub. Law No. 95-620, 92 Stat. 3289

Natural Gas Policy Act of 1978 Pub. Law No. 95-621, 92 Stat. 3351

Energy Conservation and Production Act Pub. Law No. 94-385, 90 Stat. 1125

Energy Policy and Conservation Act Pub. Law No. 94-163, 89 Stat. 871

Federal Nonnuclear Energy Research and Development Act of 1974 Pub. Law No. 93-577, 88 Stat. 1878

-25-

Energy Reorganization Act of 1974 Pub. Law No.
93-438, 88 Stat. 1233

Energy Supply and Environmental Coordination Act
of 1974, Pub. Law No. 93-319, 88 Stat. 246

Emergency Petroleum Allocation Act of 1973, Pub.
Law No. 93-159, 87 Stat. 627

Clean Air Amendments of 1970 Pub. Law No. 91-
604, 84 Stat. 1676

From those acts, the District Court determined that there was a national policy to provide incentives to increase the use of other sources of energy, including coal, so as to decrease our dependence on oil. The District Court also determined from those acts, and from the cases it examined relating to the subject, that "Congress has not and did not intend to preclude the State of Montana from imposing a tax on mining activities within the State. . ." App. at 240. It is in this conclusion of law that the plaintiffs now contend on appeal that the District Court erred: The plaintiffs do not claim that the federal acts submitted to the District Court establish a national policy which prevents Montana from levying some tax on the severance of coal. Instead, plaintiffs contend that the District Court should have allowed a factual hearing to determine whether the rate of Montana's coal severance tax substantially frustrates national policy; and that the order of the District Court precluded plaintiffs from proving what the national energy policy was.

Some seventy or eighty years ago it used to be argued that the Constitution of the United States followed the flag. Here, plaintiffs in reality are contending that the Constitution follows the Dow-Jones average.

In examining the whole of the District Court's memorandum in support of its order, we think it implicit in the District Court's opinion not only that Montana is not prohibited

-26-

by federal enactments and policy from levying a coal severance tax but also that the amount of Montana's coal severance tax is not prohibited. In any event, we find the latter conclusion is a necessary result as a matter of law under the preemption argument.

Out of the welter of cases which has been cited to us on this issue by the parties, we, upon examination of such authorities, find it safe to say that no state excise tax has ever been struck down unless it had clearly conflicted with an act of Congress in the field (M'Culloch v. Maryland, supra); and likewise, that no state excise tax is likely to be held by the United States Supreme Court to be limited as to its amount unless it is expressly or by necessary implication shown to be prohibited or that the amount interferes with a power assumed or delegated to the United States.

The essence of the rule upon which we rely here, and of the rule which we think inheres in any of the United States Supreme Court decisions on the subject is set out in Penn Dairies v. Milk Control Comm'n. (1943), 318 U.S. 261, 275, 63 S.Ct. 617, 623-24, 87 L.Ed. 748, 756-57:

> "An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous. Considerations which lead us not to favor repeal of statutes by implication, United States v. Borden Co., 308 U.S. 188, 198-9; United States v. Jackson, 302 U.S. 628, 631; Posadas v. National City Bank, 296 U.S. 497, 503-5, should be at least as persuasive when the question is one of the nullification of state power by Congressional legislation.

> ". . . Courts should guard against resolving these competing considerations of policy by imputing to Congress a decision which quite clearly it has not undertaken to make. Furthermore we should be slow to strike down legislation which the state concededly had power to enact, because of its asserted burden on the federal government. For the state is power-less to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden."

The mere statement by the plaintiffs that the Montana coal severance tax substantially frustrates a national policy for the use of western coal is not a sufficient basis to trigger a factual determination in the District Court. The scope and substance of national policy are matters of statutory interpretation. This is a matter of law not requiring the taking of testimony. Again, of course, for purposes of a motion to dismiss, a District Court is not required to accept plaintiffs allegations of law and legal conclusions as true. Newport News Co. v. Schauffler (1938), 303 U.S. 54, 58 S.Ct. 466, 82 L.Ed. 646; Mitchell v. Archibald and Kendall, Inc. (7th Cir. 1978), 573 F.2d 429, 432; Kadar Corporation v. Milbury (1st Cir. 1977), 549 F.2d 230, 233; Blackburn v. Fisk University (6th Cir. 1971), 443 F.2d 121, 124.

Whether we agree here with plaintiffs that the decision of the District Court was only to the effect that no federal enactments prohibited any coal tax is of no moment. The reason for the district judge making that finding was that he could find no federal enactment of specific policy with respect to which the Montana coal severance tax conflicted. For the same reason, when we examine plaintiffs' contention that the amount of the tax constitutes a substantial frustration of federal policy, that argument must also fall because of plaintiffs' failure to establish a federal enactment with which the amount of Montana tax conflicts or which is substantially frustrated.

We find ourselves in agreement with the District Court that the federal statutes cited do not establish domestic energy policies wherein Congress intended to nullify other national, state, local or individual policies or interests which may increase the cost of coal production in use.

-28-

Stated another way, we do not find a national domestic energy policy or congressional enactments predicated upon a Montana coal severance tax of fifteen percent or less. Indeed, the federal enactments point in other directions. There are incentives for the development of underground coal mines. 42 U.S.C. §6211. There is a provision for export restrictions. 42 U.S.C. §6212. Miners of low sulfur coal are not exempted from costly environmental strip mining regulations. 30 U.S.C. §1251, et seq. Health and safety requirements are enforced upon strip coal miners. 30 U.S.C. §801, et seq. Royalties on federal lands are payable under the Mineral Lands Leasing Act of 1920 as amended. 30 U.S.C. §181, et seq. Congress seems to prefer underground coal mining. 30 U.S.C. §1201, et seq. As the District Court found, to the distaste of the plaintiffs, Congress favors and encourages the production and use of high sulfur eastern and midwestern coal, rather than low sulfur western coal, the latter of which is to be used principally by existing facilities for which technological upgrading of air pollution control equipment is impractical or not feasible. 42 U.S.C. §§ 7411 and 7425. Indeed, §7411, as amended in 1977, requires users of low sulfur coal nevertheless to install the "best technological system of continuous emission reduction" required for all stationary sources, even though such systems may be unnecessary because the low-sulfur coal meets the emission standards. See, U.S. Code Congressional and Administrative News, 95th Congress, 1977 Session, Vol. II, at 1245. Congress would rather that eastern and mid-western plants used "local coal", even coal with higher sulfur content than western low-sulfur coal.

How then can any court determine that the effect of Montana's coal severance tax is to frustrate national policy,

-29-

when no national policy can be discerned as a matter of law?

The federal constitutional prohibition, under the Supremacy Clause, is against state laws which contravene "the laws of the United States which shall be made in pursuance of [the federal constitution]." What is wanting in plaintiffs argument is _any_ federal enactment, constitutionally adopted, which is clearly, substantially frustrated by Montana's coal severance tax.

The taxing power of the state is an essential power of its sovereignty. Weston v. City Council of Charleston (1829), 27 U.S. 171, 174 (2 Peters 449), 7 L.Ed. 481. This power cannot be set aside or limited on weightless statements that a federal policy is being substantially frustrated.

Contrary to the contention of plaintiffs, De Canas v. Bica, supra, was not sent back by the Supreme Court for a factual determination, but rather for a construction by the California courts of California statutory law. De Canas v. Bica, supra, 424 U.S. at 363-364, 96 S.Ct. at 940, 47 L.Ed.2d at 53-54. In Exxon Corp. v. Governor of Maryland (1978), 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91, reh.den. 439 U.S. 884, the United States Supreme Court rejected a contention that a broad general national policy can preempt state laws which have some indirect effect upon national policy. The court said in _Exxon_:

> "Appellants point out . . . the . . . basic
> national policy favoring free competition, and
> argue that the Maryland statute 'undermine[s]'
> the competitive balance that Congress struck
> between the Robinson-Patman and Sherman Acts.
> This is just another way of stating that the
> Maryland statute will have an anticompetitive
> effect. In this sense, there is a conflict
> between the statute and the central policy of
> the Sherman Act -- our 'charter of economic
> liberty.' Northern Pacific R. Co. v.
> United States, 356 U.S. 1, 4. Nevertheless,

-30-

this sort of conflict cannot itself con-
stitute a sufficient reason for invalidating
the Maryland statute. For if an adverse
effect on competition were, in and of itself,
enough to render a state statute invalid, the
States' power to engage in economic regulation
would be effectively destroyed. We are, therefore,
satisfied that neither the broad implications
of the Sherman Act nor the Robinson-Patman Act
can fairly be construed as a congressional decision
to pre-empt the power of the Maryland Legislature
to enact this law." 437 U.S. at 133-134, 98 S.Ct.
at 2217-2218, 57 L.Ed.2d at 104-105.

Again, under this preemption contention, a large number

of cases are cited by the parties. Recitation of their

holdings and effect would be cumulative here. Plaintiffs

have attacked the decision of the District Court upon the

ground that no court case was relied on by it to find that

Montana's coal severance tax did not contradict a federal

national policy. On this point, plaintiffs are stoking the

same furnace as did the District Court. Plaintiffs have

led us to no decision invalidating a state excise tax based

on its rate as in contravention of federal policy.

We conclude that from any viewpoint, whether as a

question of the power of the State of Montana to levy any

tax, or its power to levy a tax at the rate here set

forth, there has been no preemption by the federal government

in the field of coal severance taxation, or any national

policy derived from Congressional enactments pursuant to the

Constitution with which the Montana coal severance tax is in

conflict.

THE FEDERAL MINERAL LANDS LEASING ACT OF 1920

Here, plaintiffs assert that the severance tax violates

the Supremacy Clause of the United States Constitution on

the ground that the tax grossly distorts the "compromise"

between the federal government and the states expressed in

the Mineral Lands Leasing Act of 1920, Chapter 85, 41 Stat.

437, as amended by the Federal Coal Leasing Amendments Act

of 1975, Pub. Law No. 94-377, 90 Stat. 1083.

-31-

Plaintiffs contend the federal legislation is a result of a longstanding debate concerning the ownership, disposition and use of federally owned mineral reserves in the western territories and states. The result, claim plaintiffs, is that the federal government retained the minerals for the people of the nation, subject to the payment of a share of the mineral royalties to the states in which the minerals were located.

Under the Act of 1920, as amended, fifty percent of amounts received by the federal government from sales, bonuses, royalties and rental of public lands thereunder are returned to the respective states wherein the leased lands or deposits are located, for uses specified in the Act. Plaintiffs claim Montana is without power, because it substantially frustrates national policy, to tax the "economic rents" remaining over and above the rents and royalty payments. "Economic rents" are defined as the difference between the costs of production, including an acceptable profit, and the price which the products could obtain in the market place. Plaintiffs state that Montana has appropriated the "economic rents", which plaintiffs find to be a fundamental frustration of federal policy.

Here again, plaintiffs argue that they are not required to show an express prohibition under federal law; rather they contend that substantial frustration of the fulfillment of national policy is sufficient to render the state law unconstitutional under the supremacy clause.

The principal factor militating against plaintiffs' position on this part of their complaint is that Congress specifically allowed state taxation under the Mineral Lands Leasing Act of 1920. The Act contains this provision (30 U.S.C. §189):

". . . Nothing in this chapter shall be construed
or held to affect the rights of the States or
other local authority to exercise any rights which
they may have, including the right to levy and
collect taxes upon improvements, output of mines,
or other rights, property, or assets of any lessee
of the United States."

If indeed, a "compromise" was reached with respect to
the leasing of federally-owned mineral interests in public
lands, that compromise included, under 30 U.S.C. §189, the
right of states to tax the "output of mines". This indeed
is a clear expression of federal policy and Montana's coal
severance tax is within that policy.

In Mid-northern Oil Co. v. Montana (1925), 268 U.S.
45, 45 S.Ct. 440, 69 L.Ed. 841, affirming Mid-Northern Oil
Co. v. Walker (1922), 65 Mont. 414, 211 P. 353, the Supreme
Court said:

". . . [A]lthough the act deals with the letting of
public lands and the relations of the government
to the lessees thereof, nothing in it shall be
so construed as to affect the rights of the states,
in respect of such private persons and corporations,
to levy and collect taxes as though the government
were not concerned." 268 U.S. at 49, 45 S.Ct. at
441, 69 L.Ed. at 843.

The Supreme Court also said:

"No doubt, what Congress immediately had in mind
was the necessity of making it clear that, not-
withstanding  the interest of the government in
leased lands, the rights of the states to tax
improvements thereon and the output thereof
should not be in doubt . . .. We think the proviso
plainly discloses the intention of Congress that
persons in corporations contracting with the United
States under the act, should not, for that reason,
be exempt from any form of state taxation otherwise
lawful." 268 U.S. at 50, 45 S.Ct. at 441, 69 L.Ed.
at 843.

Again the District Court was correct in dismissing
plaintiffs complaints under count 3 as a matter of law, for
no justiciable controversy is presented by such count.

CONCLUSION

The judgment of the District Court in dismissing the
plaintiffs complaints is affirmed.

-33-

_____
                    Justice

We Concur:

_Frank I. Haswell_
      Chief Justice

_Gene B Daly_

_John Conway Harrison_

_____
              Justices

-34-