NO. 93-290

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

WESTMORELAND RESOURCES, INC.,

    Petitioner and Appellant,

v.

MONTANA DEPARTMENT OF REVENUE,

    Respondent and Respondent.

FILED

FEB 04 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Big Horn,
The Honorable Robert W. Holmstrom, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

        W. Anderson Forsythe, Moulton, Bellingham,
        Longo & Mather, Billings, Montana

    For Respondent:

        David L. Nielsen, Tax Counsel, Office of Legal
        Affairs, Department of Revenue, Helena, Montana


Submitted on Briefs:  December 2, 1993

Decided:  February 4, 1994

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

In 1989, Westmoreland Resources, Inc., petitioned the State Tax Appeal Board (STAB) to review the Montana Department of Revenue's (DOR) assessment of additional taxes imposed on Westmoreland for revenue received due to adjustment formulas found in four of its contracts for the sale of coal. After the STAB ruled in the DOR's favor, Westmoreland petitioned the District Court for the Thirteenth Judicial District in Big Horn County pursuant to § 15-2-303, MCA, for review of this decision. The District Court concluded that the STAB correctly interpreted the applicable law and that its findings were not clearly erroneous. Therefore, by order dated April 15, 1993, the court affirmed the decision of the STAB. Westmoreland appeals from the order of the District Court.

We affirm.

On appeal, Westmoreland raises the following issues:

1. Did the District Court err when it found that revenue received by Westmoreland pursuant to an adjustment formula in its sales contracts is part of the "contract sales price" for purposes of the assessment of coal severance and gross proceeds taxes?

2. Did the District Court err when it found that revenue received pursuant to the adjustment formula is properly considered in the assessment of the resource indemnity trust tax?

3. Does the taxation of this revenue violate the Commerce Clause of the United States Constitution?

Westmoreland produces coal in Rosebud County, Montana, and sells this coal to various midwest electric utility companies. At issue in this appeal are four sales contracts which Westmoreland negotiated in 1972 with Northern States Power in Minnesota, Dairyland Power and Light in Wisconsin, Wisconsin Power and Light in Wisconsin, and Interstate Power in Iowa.

The four contracts have a similar pricing structure and include a formula which is used to adjust the price of the coal to compensate for variations in its BTU content. BTU refers to British Thermal Units and is a measure of the heat energy contained in the coal.

The contract with Northern States Power (NSP) was the only contract entered into evidence and will be used as an example in this discussion. Each contract establishes a base price for the coal, which is $2.30 per ton in the NSP contract. This base price is "f.o.b. railroad cars" at Westmoreland's mine in Montana. F.o.b. is a commercial acronym commonly defined as "free on board." In this instance, where the contract establishes the price of coal f.o.b. railroad cars, it means that delivery to the customer is complete when the coal is loaded onto the railroad cars at the mine. The customer then independently negotiates with the railroad company for transportation of the coal to its electric utility sites.

The contracts also provide for various adjustments to the base price of the coal. First, certain adjustments are periodically made for changes in the cost of producing the coal. For example,

3

the NSP contract provides for the base price to be adjusted periodically to reflect changes in administrative expenses, wages paid for labor, and cost of equipment.

Second, the contracts include a price adjustment to reflect variations in the quality of coal. Each contract includes a target rate or "warranted rate" for the BTU content of the coal that is sold. In the NSP contract, the warranted rate is 8450 BTU. If the weighted average BTU content is between 8350 BTU and 8550 BTU, no adjustment is made in the sale price. However, if the average BTU content is either higher or lower than these figures, the following calculation is made in order to standardize the price that the customer is paying for the coal based on its energy content:

$$(P + T) \ x \ \frac{(as \ received \ BTU - Warranted \ BTU)}{(Warranted \ BTU)}$$

$$P = base \ price, \ as \ adjusted, \ per \ ton$$
$$T = transportation \ rate, \ per \ ton$$

This formula establishes a fraction (the "BTU fraction") which represents a comparison of the "as received BTU" to the "warranted BTU." The BTU fraction is then multiplied by the sum of the base price per ton of coal and the average transportation rate per ton of coal, to yield an "adjustment factor.'* To determine the amount by which the price of the coal which was purchased is adjusted, the adjustment factor is multiplied by the number of tons shipped to the respective customer annually.

The contracts provide that after the adjustment is calculated, "seller will issue a debit or credit." In other words, if the customer overpaid for the coal because the BTU content was lower

4

than the warranted rate, Westmoreland is responsible for issuing that customer a credit.  However, if the customer did not pay enough for the coal because its BTU content was higher than the warranted rate, the customer must pay Westmoreland an additional amount of money for the higher quality coal that was purchased.

It is important to note that the adjustment formula results in either a transfer of money from Westmoreland to the customer, or from the customer to Westmoreland.  Even though the formula takes into account an average transportation rate to arrive at the adjustment factor, the money the customer pays to the railroad is not affected by the adjustment formula.  The cost of transportation remains the same for each ton of coal that is shipped regardless of its BTU content.

During the years in question, Westmoreland was able to achieve a higher average BTU content for the coal it produced and sold than what was warranted in the four contracts.  This resulted in Westmoreland's receipt of additional revenue from these four customers due to the adjustment formula.

Westmoreland negotiated these four contracts prior to the enactment of Montana's current tax structure for the production of coal.

Three separate taxes are now imposed on coal produced in this state:  the gross proceeds tax found at §§ 15-23-701 through -716, MCA; the coal severance tax found at §§ 15-35-101 through -122, MCA;  and the resource indemnity trust tax (RITT) found at §§ 15-38-101 through -136, MCA.

5

The taxes assessed pursuant to the gross proceeds tax and the coal severance tax are calculated on the basis of what is termed "the contract sales price" of the coal. Contract sales price is defined in § 15-35-102(5), MCA, as follows:

> "Contract sales price" means either the price of coal extracted and prepared for shipment f.o.b. mine, excluding that amount charged by the seller to pay taxes paid on production, or a price imputed by the department under 15-35-107.

The RITT is computed on the gross value of the coal at the time it is extracted from the ground. The DOR determines the gross value at the point of extraction by deducting from the contract sales price f.o.b railroad cars at the mine, the costs of hauling, crushing and preparing the coal for shipment.

In 1986, the DOR audited Westmoreland's gross proceeds, severance, and RITT tax returns for tax years 1981 through 1984. The DOR determined that payments received pursuant to the adjustment formula had been improperly excluded from Westmoreland's calculation of the "contract sales price" for the assessment of severance and gross proceeds taxes, and from the calculation of "gross value" for the assessment of RITT taxes. Based on this determination, the DOR imposed additional taxes on Westmoreland for the tax years 1981 through 1984. Westmoreland appealed this assessment of additional taxes to the STAB. Following an evidentiary hearing, the STAB ruled that the revenue received by Westmoreland pursuant to the adjustment formula was properly included by the DOR in the computation of taxes owed by Westmoreland. The STAB found that, for the years 1981 through

6

1984, Westmoreland had received additional revenue because the BTU content of the coal it had sold exceeded the rate warranted in the sales contracts. It noted that Westmoreland had paid taxes on the revenue it received due to the "price component" of the adjustment formula, but not on revenue received due to what Westmoreland called the "transportation component" of the formula. After considering the adjustment formula, the STAB found:

> 10. All freight or shipping costs from the mine to the various destinations of the coal are negotiated and paid by the purchasers, and not by [Westmoreland]. The freight rate is a per ton rate. The quality of the coal being shipped has no effect on the determination of the rate. <u>Any adjustments made using the contractual formula, resulting in either an increase or decrease in the price of the coal would not result in a payment to, or from, the railroad. The transaction is entirely between the purchaser of the coal and [Westmoreland].</u> [Emphasis added].

In Finding No. 19, the STAB found that "the adjustment is seen as a protection of quality. The adjustment has no effect on the amount paid to the hauler." Finally, the STAB found that there is "nothing done to the coal during transportation that modifies in any way, positively or negatively, the BTU content. Once loaded in the railcar, the BTUs contained in the coal are set."

In its conclusions of law, the STAB concluded that, under the contracts in question, the final price per ton of coal is not established until all of the adjustments provided for in the contracts are made. It stated the following:

> 13. It is the opinion of this Board that the adjustment formula, in its entirety, found in the coal purchase contracts, as it affects the "contract sale price," is a recognized contract modifier to the base price of the coal f.o.b. mine. As such, it is a proper

7

## ISSUE 1

Did the District Court err when it found that revenue received by Westmoreland pursuant to an adjustment formula in its sales contracts is part of the "contract sales price" for purposes of the assessment of coal severance and gross proceeds taxes?

Westmoreland contends that both the STAB and the District Court made erroneous conclusions of law and fact when they held that the definition of contract sales price includes the transportation portion of the BTU adjustment formula.

The crux of Westmoreland's argument is that the adjustment formula found in the four relevant contracts contains a price related component and a transportation related component. According to Westmoreland, the formula adjusts not only the mine head price of the coal but also the cost per ton of transporting the coal.

Westmoreland asserts that, during the years in question, it paid taxes on the additional revenue attributable to the price or "P" component of the formula, but not on revenue received pursuant to the transportation or "T" component. Taxes were paid on only part of the additional revenue because, according to Westmoreland, the transportation related revenue was not part of the contract sales price, which is the basis for the computation of taxes owed. This assertion is based on § 15-35-102(5), MCA, which defines contract sales price as "the price of coal extracted and prepared for shipment f.o.b. mine." Consequently, Westmoreland asserts that transportation costs, which occur after the coal is delivered

9

f.o.b. railroad cars at the mine, should not be included in the contract sales price.

In response, the DOR contends that the STAB and the District Court correctly found that revenue resulting from the BTU adjustment formula, which takes into account both the base price per ton and the average transportation rate per ton, constitutes the final contract price which each customer pays to Westmoreland for the coal it purchases. The DOR asserts that it was proper to find that the adjustment formula does nothing to alter actual transportation costs, but rather determines the final amount owed to Westmoreland for the purchase of coal.

The DOR further contends that there was substantial evidence to support the STAB's finding that both the BTU content and the actual freight costs of each shipment of coal are known prior to shipment. Therefore, all the formula components are "known" and fixed at the time the coal is loaded for shipment. The DOR argues that the STAB correctly concluded that, although it is Westmoreland's and its customers' choice to calculate price adjustments only annually, the adjusted cost of each shipment of coal, payable by the customer to Westmoreland, is ascertainable at the time the coal is loaded for shipment f.o.b. railroad cars and does not change after shipment.

It is DOR's assertion that the contract sales price, as the term implies, includes every component of the contract that is used to determine the price which the buyer pays for the coal. Furthermore, the DOR contends that taxes are to be assessed on this

10

final purchase price (the "contract sales price") rather than on selective, internal components of a formula used to calculate that final price.

We note first that Westmoreland contends that the STAB made clear errors of both law and fact. When reviewing an administrative agency's findings of fact, this Court will defer to the agency's findings unless they are clearly erroneous. Findings of fact are clearly erroneous if they are not supported by substantial credible evidence. *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 803 P.2d 601. Our standard for reviewing legal conclusions of an agency or a district court is simply to determine whether they are correct. steer, 803 P.2d at 603.

In this instance, Westmoreland contends that the STAB erred factually when it found that all revenue received pursuant to the adjustment formula was part of the "contract sales price" for assessment of the coal severance and gross proceeds taxes. The alleged error of law is based on the STAB's and the District Court's conclusions that the statutory definition of contract sales price could include this revenue.

After considering the evidence in the record and reviewing the findings and conclusions entered by the STAB and affirmed by the District Court, we conclude that there was substantial evidence to support the STAB's factual determinations. Furthermore, we conclude that the STAB's and the District Court's conclusions of law were correct.

11

The record contains sufficient evidence that each customer negotiates solely with the railroad company regarding transportation costs. Westmoreland is not responsible for paying any transportation costs and all of the revenue received after adjusting the contract price goes solely to Westmoreland, whose business is the sale of coal, rather than to the railroad.

Furthermore, the evidence demonstrated that the freight rate charged by the railroad is a constant rate per ton, the BTU content of the coal which is being shipped has no effect on the determination of that rate, and the BTU content of the coal does not change during shipping. Thus, the year-end adjustment, which takes into account the particular customer's negotiated base price per ton and average transportation rate per ton, adjusts the cumulative sales price of the coal purchased during that year, but does nothing to alter the actual cost that was paid to the railroad to transport that coal. Instead, the year-end adjustment sets the final price of the coal to properly reflect the quality of the coal which was shipped as compared to that which was warranted in the contract.

A review of the record also supports the contention that, although price adjustments are made annually, which necessarily occurs after shipping, the adjusted cost of each shipment of coal, payable by the customer to Westmoreland, is ascertainable at the time the coal is loaded for shipment f.o.b. railroad cars, and does not change after shipment.

12

The evidence is undisputed that Westmoreland is not paid to transport the coal. Therefore, we conclude that the revenue in question does not constitute transportation costs incurred subsequent to delivery of the coal f.o.b. mine. In this case, the revenue received by Westmoreland represents the final, adjusted contract price of the coal which is determined by considering its BTU content and applying the formula agreed upon by the parties. Although a transportation rate is included in the formula, the formula adjusts the price payable to Westmoreland for the coal, and not the costs payable to the railroad for the transportation of that coal. The formula adjusts the final price of the coal at the time it is delivered to the customer f.o.b. railroad cars at the mine.

According to the STAB's findings, application of the formula as provided for in the contract would result in an increased contract sales price when the BTU content of the coal is above the target rate, or conversely, a lower contract sales price when the BTU content is below the target rate. Therefore, if revenue decreases due to lower quality coal, the taxes assessed on the contract sales price would correspondingly decrease. We conclude that this would be the correct outcome. If Westmoreland or other coal producers had to reimburse their customers because the coal it extracted had a lower BTU content, the computation of taxes should consider this loss of revenue and the contract sales price should be adjusted accordingly.

13

We hold that there was sufficient evidence to support the STAB's findings that the BTU adjustment formula in its entirety is part of the contract sales price, and that revenue resulting from the application of this formula represents the actual price paid by the customer for the coal it purchases from Westmoreland. Furthermore, we conclude that the STAB and the District Court properly interpreted the statutory and regulatory definitions of contract sales price and f.o.b. mine price to include the final, adjusted price of the coal pursuant to these contracts. Therefore, we hold that the DOR properly included revenue resulting from the BTU adjustment formula in the assessment of coal severance and gross proceeds taxes.

## ISSUE 2

Did the District Court err when it found that revenue received pursuant to the adjustment formula is properly considered in the assessment of the resource indemnity trust tax?

Westmoreland contends that the RITT tax is imposed on the gross value of the product at the time of extraction from the ground, and therefore, all transportation related revenue which is incurred after extraction from the ground should be excluded from the value of the coal for purposes of assessing the taxes due pursuant to the RITT.

The DOR agrees that the coal is to be valued at the point of extraction for the purposes of the RITT. To arrive at this gross value, the DOR starts with the contract sales price and then deducts the costs associated with hauling the coal from the mine to

14

the railroad cars, and crushing and preparing it for shipment. Because the contract sales price is the starting point for assessing the RITT tax, the DOR contends that the STAB and the District Court correctly held that the adjusted contract sales price, which takes into account revenue received pursuant to the adjustment formula, is the starting point for determining the value of the coal for the assessment of the RITT taxes.

We have already decided that the adjustment formula yields a final contract sales price, which is the price paid for the purchase of coal exclusive of transportation costs incurred after the coal is delivered f.o.b. railroad cars. Thus, we conclude that the gross value of the coal is properly determined by deducting from the adjusted contract sales price the costs associated with preparing the coal for shipment and transporting it from the mine head to the railroad cars. Therefore, to the extent that the adjusted contract sales price is the starting point for calculating the gross value of the coal produced by Westmoreland, we hold that the court did not err when it upheld the STAB's conclusion that revenue received pursuant to the adjustment formula is properly considered by the DOR for the purposes of assessing the RITT taxes.

<u>ISSUE 3</u>

Does the taxation of this revenue violate the Commerce Clause of the United States Constitution?

Westmoreland contends that the DOR's taxation of the revenue received from the adjustment formula results in discriminatory taxation of transportation costs and that this violates the

15

commerce clause of the United States Constitution. U.S.C.A. Const Art. I, § 8, cl. 3. We note that this constitutional challenge is based upon Westmoreland's interpretation of the holdings in *Commonwealth Edison Company v. Montana* (1981), 453 U.S. 609, 101 S. ct. 2946, 69 L. Ed. 2d 884, and *Commonwealth Edison Company v. state* (1980), 189 Mont. 191, 615 P.2d 847, and its contention that the DOR is taxing transportation costs rather than the value of the coal.

The U.S. Supreme Court upheld the constitutionality of Montana's coal severance tax in *Commonwealth Edison*, 453 U.S. at 609, on the basis that the severance tax does not discriminate against interstate commerce and is apportioned to activities occurring within the State, i.e., the production of coal, taxed at its value f.o.b. mine. In *CTS Corporation v. Dynamics Corporation of America* (1987), 481 U.S. 69, 107 S. Ct. 1637, 95 L. Ed. 2d 67, the Court reemphasized the principle that a state statute does not violate the commerce clause if it is evenhandedly applied without regard to whether the activity is interstate or intrastate in nature.

We have held that the BTU adjustment formula adjusts the contract sales price of the coal, and that revenue received pursuant to this adjustment formula does not constitute transportation related revenue. The Montana coal production taxes are assessed uniformly on the basis of the "contract sales price," as determined by the parties' contracts, without regard to whether the coal is to be shipped interstate or intrastate, and are not based on transportation costs. Therefore, taxation of the revenue

16

received due to the BTU adjustment formula, which is part of the contract sales price, is nondiscriminatory and does not violate the commerce clause of the United States Constitution. We hold that the District Court correctly concluded that Westmoreland's constitutional challenge was without merit.

For these reasons, the judgment of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

17