No. 93-617

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

THE STATE OF MONTANA, by and
through its DEPARTMENT OF SOCIAL
AND REHABILITATION SERVICES,

        Petitioner and Respondent,

  vs.

SHODAIR HOSPITAL,

        Respondent and Appellant.

FILED

AUG 25 1995

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Jeffrey Sherlock, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            John F. Sullivan; Hughes, Kellner, Sullivan &
            Alke, Helena, Montana

        For Respondent:

            Gregory G. Gould, Special Attorney General,
            Department of Social and Rehabilitation Services,
            Helena, Montana

Submitted on Briefs:  March 9, 1995

Decided:  August 25, 1995

Filed:

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Shodair Hospital (Shodair) appeals from an order of the First Judicial District Court, Lewis and Clark County, reversing a decision of the Board of Social and Rehabilitation Services Appeals (Board) which awarded Shodair medicaid reimbursement for a patient's hospitalization and reinstating the hearing examiner's decision which denied reimbursement. We affirm.

We restate the issues on appeal as follows:

1. Did the District Court err in rejecting the Board's finding that Shodair had met the Medicaid Inpatient Psychiatric Services manual criteria?

2. Does substantial evidence support the hearing examiner's finding that Shodair failed to meet the MIPS manual criteria?

3. Does compliance with the MIPS manual criteria equate to a "significant danger" to the patient or others determination under § 46.12.590(2)(k), ARM (1991), thereby entitling a treatment provider to medicaid reimbursement for a patient's treatment?

4. Does substantial evidence support the hearing examiner's finding that Shodair was not entitled to medicaid reimbursement for D.B.B.'s inpatient psychiatric care because it failed to demonstrate that D.B.B. posed a significant danger to herself, others, or the public safety as required by § 46.12.590(2)(k), ARM (1991)?

5. Was D.B.B.'s treatment at Shodair "medically necessary" under § 46.12.102(2), ARM (1991)?

Issues three through five are dependent on a determination of error on issue two. Thus, our holding below that substantial evidence supports the hearing examiner's finding that Shodair failed to meet the MIPS manual criteria is dispositive and we need not address the remaining issues.

2

## Factual and Procedural Background

D.B.B., a sexually, physically, and emotionally abused eight-year-old girl, was admitted to Shodair on August 8, 1991, for inpatient psychiatric treatment of post-traumatic stress disorder. D.B.B. was discharged from Shodair to a foster home on September 19, 1991. Shodair applied to the Department of Social and Rehabilitation Services Medicaid Services Division (SRS) seeking medicaid reimbursement for D.B.B.'s treatment. SRS reimbursed Shodair for inpatient treatment provided to D.B.B. from August 8, 1991, through August 23, 1991. It denied reimbursement for the later portion of D.B.B.'s treatment, based on its determination that inpatient services were not medically necessary during that time. This case involves Shodair's effort to obtain reimbursement from SRS under the state medicaid inpatient psychiatric services program for the later portion of D.B.B.'s inpatient treatment.

Pursuant to 42 U.S.C.A. § 1396a(30)(A) (West Supp. 1995), states are required to implement procedures regarding the utilization of, and reimbursement for, services rendered under a state medical assistance plan; the purpose of the procedures is to protect against unnecessary use of services and "assure that payments are consistent with efficiency, economy, and quality of care." One aspect of such a state plan is the creation of "a statewide surveillance and utilization control program" that, among other things, must safeguard against excess medicaid payments. 42 C.F.R. § 456.3(a) (1994). SRS is the state agency responsible for creating and managing the utilization program to "ensur[e] that

3

services provided through the medicaid program are . . . consistent with both state and federal laws, rules, and regulations establishing the conditions of reimbursement." Section 46.1.101(2)(c)(iii), ARM.

Section 46.12.590(3), ARM (1991), authorizes medicaid reimbursement for hospital inpatient psychiatric care if a person's psychiatric condition "pose[s] a significant danger to self, others, or the public safety." Section 46.12.590(2)(k), ARM (1991). The treatment must be provided under the direction of a physician and must be designed to discharge the patient to a less restrictive setting as soon as possible. Section 46.12.590(2)(k), ARM (1991).

SRS contracted with Mental Health Management of America (MHMA) to develop and implement a utilization management program to review inpatient psychiatric treatment services provided to medicaid recipients under the age of 21 pursuant to the Montana Medicaid Inpatient Psychiatric Services Under 21 program (MIPS). Pursuant to the contract, MHMA developed a MIPS manual for use by reviewers of medicaid reimbursement claims under the program. The manual, which was distributed to inpatient psychiatric treatment providers, including Shodair, contained criteria relating to reimbursement for hospital inpatient psychiatric treatment. The listed criteria require treatment providers to demonstrate, with regard to a patient's inpatient psychiatric treatment, that they have: (1) diagnosed the patient as having an Axis I mental disorder delineated in the Diagnostic and Statistical Manual Third Edition-

4

Revised (DSM-III-R); (2) obtained a DSM-III-R Axis V rating of 50 or less regarding the patient's functional level; (3) developed a description of the treatment and discharge plan; and (4) identified and documented one of four specific problem areas.

In this case, SRS initially denied reimbursement for the later portion of D.B.B.'s inpatient treatment at Shodair. Shodair requested, and received, a "fair hearing" pursuant to § 46.12.1210(2), ARM (1991), after which the hearing examiner issued extensive findings of fact, conclusions of law and an order denying reimbursement. The hearing examiner determined that Shodair did not meet the MIPS manual criteria relating to reimbursement for hospital inpatient psychiatric treatment.

Shodair appealed to the Board, which summarily reversed the hearing examiner's decision. The Board found that, based on the "undisputed facts" of record, Shodair had met the MIPS manual criteria as a matter of law and that satisfying those criteria also satisfied the "significant danger" requirement contained in § 46.12.590(2)(k), ARM (1991). As a result, the Board determined that Shodair was entitled to medicaid reimbursement for the later portion of D.B.B.'s inpatient psychiatric treatment.

SRS petitioned for judicial review of the Board's decision. The District Court concluded that the hearing examiner had impliedly, and correctly, determined that Shodair failed to satisfy one of the MIPS manual criteria relating to reimbursement for hospital inpatient psychiatric treatment. The court also concluded that the Board erred in summarily rejecting the hearing examiner's

5

findings and in determining that meeting the MIPS criteria was sufficient to establish that a patient poses a "significant danger" under § 46.12.590(2)(k), ARM (1991). The District Court reinstated the hearing examiner's decision denying medicaid reimbursement for D.B.B.'s treatment at Shodair from August 23 to September 19, 1991. Shodair appeals.

1. Did the District Court err in rejecting the Board's finding that Shodair had met the Medicaid Inpatient Psychiatric Services manual criteria?

Shodair contends that the District Court erred in reinstating the hearing examiner's decision denying Shodair medicaid reimbursement. It argues that the Board correctly rejected the hearing examiner's findings and conclusions and awarded Shodair reimbursement for D.B.B.'s stay. SRS argues that the Board did not comply with § 2-4-621(3), MCA. The District Court determined that the Board violated § 2-4-621(3), MCA, and we agree.

Section 2-4-621(3), MCA, prohibits the Board from rejecting or modifying the hearing examiner's findings of fact unless it states with particularity that the findings were not based on competent substantial evidence. Nowhere in the Board's brief order does it reject or modify any of the hearing examiner's extensive findings, much less state with particularity that the finding or findings were not based on competent substantial evidence. Instead, the Board summarily reversed the hearing examiner's decision, stating that it "finds that based on undisputed facts in the record," Shodair met the MIPS manual criteria as a matter of law.

The purpose of § 2-4-621(3), MCA, as is the case with many of

6

this Court's standards of review, is to prevent a reviewing body from substituting its judgment for that of the factfinder. Here, the Board's order merely substitutes its judgment for that of the hearing examiner with regard to findings of fact; in doing so, the Board violated § 2-4-621(3), MCA.

Section 2-4-704(2)(a)(vi), MCA, authorizes a reviewing court to reverse the Board's decision if it was "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion[.]" A rejection of a hearing examiner's findings in violation of § 2-4-621(3), MCA, constitutes an abuse of discretion under § 2-4-704(2)(a)(vi), MCA. Brander v. Mont. Dep't of Institutions (1991), 247 Mont. 302, 308, 806 P.2d 530, 533.

Thus, we conclude that, in violating § 2-4-621(3), MCA, the Board abused its discretion. We further conclude, on that basis, that the District Court did not err in reinstating the hearing examiner's extensive finding of fact for purposes of judicial review.

> 2. Does substantial evidence support the hearing examiner's finding that Shodair failed to meet the MIPS manual criteria for hospital inpatient psychiatric treatment?

Shodair and SRS disagree regarding whether satisfying the MIPS manual criteria also suffices to meet the "significant danger" requirement of § 46.12.590(2)(k), ARM (1991), and the "medical necessity" requirement of § 46.12.102(2), ARM (1991), for medicaid reimbursement as a matter of law. It is undisputed, however, that a provider of inpatient psychiatric services must satisfy the four criteria contained in the MIPS manual to establish entitlement to

7

medicaid reimbursement for an individual's inpatient psychiatric treatment.

The parties do not dispute that Shodair established, and the hearing examiner correctly found, that D.B.B.'s condition met three of the four MIPS manual criteria. They disagree on whether Shodair met the fourth criterion of identifying and documenting a listed problem area; specifically, whether Shodair established the problem area entitled "Impaired Safety: Threat to Self or Others." Under the MIPS manual, the Impaired Safety problem area consists of three components: (1) verbalization or gestures of intent to harm self or others, caused by a mental disorder; (2) threats accompanied by depressed mood, recent loss, recent suicide attempt or gesture, or concomitant substance abuse; and (3) verbalization escalating in intensity, or verbalization of intent accompanied by gesture or plan. Each of the components must be established in order to satisfy the fourth MIPS manual criterion.

A. Implied Finding

This Court has adopted the doctrine of implied findings for purposes of reviewing findings of fact. Interstate Brands Corp. v. Cannon (1985), 218 Mont. 380, 384, 708 P.2d 573, 576. That doctrine provides that where the "findings are general in terms, any findings not specifically made, but necessary to the [determination], are deemed to have been implied, if supported by the evidence." Interstate Brands, 708 P.2d at 576 (citations omitted). We apply the doctrine only if the implied findings are consistent with express findings. Interstate Brands, 708 P.2d at

8

576.

For the most part, the hearing examiner addressed the components of the Impaired Safety problem area in a systematic manner. With regard to the first component, the hearing examiner expressly found that D.B.B. had verbalized an intent to harm both others and herself and that these threats were probably caused by her mental disorder. Under the second component, relating to the patient's recent loss, the hearing examiner found that D.B.B.'s threats were accompanied by "the recent loss of her family . . . loss of self and loss of self-esteem."

The third component is comprised of two alternatives: the patient's verbalization of intent to harm self or others must be accompanied by gestures or plans or escalating in intensity. The hearing examiner expressly found that the record did not support a finding that D.B.B.'s verbalizations of intent to harm herself or others were accompanied by gestures or plans or a finding that verbalizations of intent to harm herself escalated in intensity. Shodair does not dispute the finding related to verbalizations accompanied by gesture or plan and, for purposes of appeal, has conceded that the record does not support a finding that D.B.B.'s verbalizations of intent to harm herself had escalated in intensity. Thus, the only portion of the third component of the Impaired Safety problem area at issue is whether D.B.B.'s verbalizations of intent to harm others escalated in intensity.

The hearing examiner did not make an express finding regarding the "escalating in intensity" factor. She continued her discussion

9

regarding the third component by finding that D.B.B. had harmed peers, including one incident which could have posed a danger, but that Shodair's treatment after the incident rendered the event insignificant. She also found that D.B.B. did not have a serious intent to harm and that she was not frequently violent. Shodair does not challenge these express findings. The hearing examiner concluded by finding that "[criterion] (4) of the Department's criteria for hospital inpatient psychiatric treatment has not been met."

The hearing examiner made systematic, express, and undisputed findings that the first two Impaired Safety problem area components had been established and that portions of the third component had not been established. Those express findings, together with her finding that Shodair failed to establish the fourth MIPS manual criterion, permitted the District Court to determine that the hearing examiner had necessarily found that the escalating in intensity portion of the third component had not been established, if such a finding is supported by the evidence. See Interstate Brands, 708 P.2d at 576. This is so because the finding that D.B.B.'s verbalizations were not escalating in intensity was necessary for the examiner's ultimate finding that the MIPS manual criteria were not met. Moreover, the implied finding is entirely consistent with the express findings made by the hearing examiner and with the general finding that Shodair failed to meet the fourth MIPS manual criterion. See Interstate Brands, 708 P.2d at 576. Thus, all that remains is to determine whether the implied finding

10

is supported by substantial credible evidence.

B. Substantial Evidence

An implied finding must be not only necessary to the judgment, but also supported by the evidence. Interstate Brands, 708 P.2d at 576. When reviewing an administrative agency's findings of fact, courts defer to the agency's findings unless they are clearly erroneous. Section 2-4-704(2)(a)(v), MCA; Westmoreland Resources v. Dep't of Revenue (1994), 263 Mont. 303, 310, 868 P.2d 592, 596. Generally, findings of fact are not clearly erroneous if they are supported by substantial credible evidence. Westmoreland Resources, 868 P.2d at 596. Substantial evidence must be more than a scintilla, but may be less than a preponderance, of evidence. Miller v. Frasure (1991), 248 Mont. 132, 137, 809 P.2d 1257, 1261.

Both Shodair's records of D.B.B.'s hospitalization and expert testimony at the hearing provide substantial evidence supporting the implied finding that D.B.B.'s intent to harm others was not escalating in intensity. D.B.B.'s hospitalization records documented that in forty-three days of hospitalization, she was involved in five or six disputes with staff members or peers. These incidents involved yelling obscenities at a staff member, "invading another peer's space," discussion of how she feared she would kill someone if she returned home, and shoving a peer during an activity. The medical records establish that D.B.B.'s physical conflicts were infrequent and that she had not seriously injured an individual.

In addition, Dr. Larry Osborn (Osborn) testified that, based

11

on his review of the medical records, Shodair failed to document that D.B.B. had verbally threatened or promised to hurt someone and did not demonstrate how any of D.B.B.'s verbalizations escalated in intensity. He opined that, although D.B.B.'s recreation often contained some violent aspect, nothing in the record confirmed that she took the initiative or had the means to hurt her peers. He also suggested that the record supported a conclusion that D.B.B. learned not to express her anger in an inappropriate manner, such as hitting an individual, but to redirect her anger in a positive manner by punching pillows or taking "time out." In Osborn's opinion, nothing in D.B.B.'s medical record established that D.B.B. was impulsive, violent, or dangerous to others.

The record contains substantial credible evidence supporting a finding that Shodair failed to establish that D.B.B.'s verbalizations of intent to harm others escalated in intensity and, therefore, failed to establish the third Impaired Safety component. Such a finding is consistent with the hearing examiner's findings--not disputed here--that D.B.B. lacked serious intent to harm and was not frequently violent and with her general express finding that Shodair failed to meet the fourth MIPS manual criterion.

Shodair relies on other evidence of record to support its position that D.B.B.'s verbalization of intent to harm others increased in intensity. "We will not substitute our judgment for that of the [fact finder] even where there is evidence in the record to support contrary findings." Estate of Alcorn (1994), 263 Mont. 353, 360, 868 P.2d 629, 633. Thus, we decline to review

12

Shodair's citations to the record and to determine whether that evidence supports the finding Shodair advocates.

We conclude that the District Court did not err in determining that the hearing examiner had impliedly found that Shodair did not establish the "escalating in intensity" component and that the implied finding was supported by substantial credible evidence and was not clearly erroneous. We further conclude that the hearing examiner did not err in determining, on that basis, that Shodair failed to meet the MIPS manual criteria. We hold, therefore, that the District Court did not err in reinstating the hearing examiner's decision which denied Shodair medicaid reimbursement for the later portion of D.B.B.'s inpatient psychiatric treatment.

Affirmed.

_____
Justice

We concur.

_____
Chief Justice

_____

_____

_____
Justices

_____
The Honorable Ted L. Mizner,
District Court Judge, sitting
for Justice W. William Leaphart

13

Justice Terry N. Trieweiler dissenting.

I dissent from the majority opinion.

What is notably absent from the hearing examiner's decision, the District Court's decision, or the majority opinion, is any mention of the enabling statute pursuant to which medical services are reimbursed by the Medicaid program. While I do not disagree with the majority's analysis of the evidence in this case as applied to the nearly indecipherable MIPS criteria, I do conclude that the Administrative Rule pursuant to which those criteria were developed was neither consistent with nor reasonably necessary to effectuate the purpose of its enabling statute, and therefore, was ineffective. For these reasons, I would reverse the decision of the District Court and remand to the hearing examiner for consideration of the evidence as applied to the only true requirement for Medicaid reimbursement which is established by statute.

The enabling statute for the Administrative Rules relied on by the department, the hearing examiner, the District Court and the majority is set forth at § 53-6-101, MCA, which provides as follows:

> (1) There is a Montana medicaid program established for the purpose of providing necessary medical services to eligible persons who have need for medical assistance. The Montana medicaid program is a joint federal-state program administered under this chapter and in accordance with Title XIX of the federal Social Security Act (42 U.S.C. 1396, et seq.), as may be amended. The department of social and rehabilitation services shall administer the Montana medicaid program.

14

(2) Medical assistance provided by the Montana medicaid program includes the following services:
(a) inpatient hospital services;

. . . .

(3) Medical assistance provided by the Montana medicaid program may, as provided by department rule, also include the following services:

. . . .

(k) inpatient psychiatric hospital services for persons under 21 years of age;

. . . .

(6) The services provided under this part may be only those that are medically necessary and that are the most efficient and cost-effective.

(Emphasis added.)

In other words, the Department may, by departmental rule, decide whether or not services for inpatient psychiatric care are reimbursed. However, the criteria for reimbursement are established by subparagraph (6) and provide only two requirements:

(1) that the services be medically necessary, and
(2) that they be the most efficient and cost-effective means of treatment.

Rule 46.12.590, ARM (1990), upon which the hearing examiner's decision is based and pursuant to which that decision was affirmed by this Court was enacted pursuant to § 53-6-101(3)(k), MCA. However, it adds to the statutory criteria an additional requirement for reimbursement of inpatient psychiatric services. It provides in subparagraph (k):

"Hospital inpatient psychiatric care" means hospital based active psychiatric treatment provided under the direction of a physician. The individual's psychiatric condition must be of such a nature as to pose a significant danger to self, others, or the public safety, or one which has resulted in marked psychosocial dysfunction or grave disability of the individual. The therapeutic intervention or evaluation must be designed to achieve the patient's discharge from inpatient

15

hospital status to a less restrictive environment at the earliest possible time.

(Emphasis added.)

The underlined portion of subparagraph (k) adds an additional requirement to the statutory requirements for reimbursement of in-patient psychiatric care. It is, therefore, inconsistent with its enabling statute and is unenforceable.

In *Michels v. Department of Social and Rehabilitation Services* (1980), 187 Mont. 173, 177-78, 609 P.2d 271, 273, we stated that:

> Whatever force and effect the regulation has must derive from the statute under which it is enacted, and a regulation in conflict with that statute is without effect. See, 2 Am. Jur. 2d *Administrative Law* § 289, and *Bell v. Department of Licensing* (1979), 182 Mont. 21, 594 P.2d 331, 36 St. Rep. 880. "It is axiomatic that a statute cannot be changed by administrative regulation." *State ex rel. Swart v. Casne* (1977) 172 Mont. 302, 308, 564 P.2d 983, 986.

Likewise, in *Bick v. State, Department of Justice* (1986) 224 Mont. 455, 458-59, 730 P.2d 418, 421, we held that:

> A valid rule must meet both prongs of a two-prong test to determine whether or not it harmonizes with its enabling legislation. It must not engraft additional and contradictory requirements on the statute, and it must not engraft additional non-contradictory requirements on the statute which were not contemplated by the legislature. *Bell v. Department of Licensing,* supra, 182 Mont. at 23, 594 P.2d at 333. The rule also must be reasonably necessary to effectuate the purpose of the statute. *Board of Barbers of the Department of Professional and Occupational Licensing v. Big Sky College* (Mont. 1981), 626 P.2d 1269, 1270, 38 St. Rep. 621, 623.

The requirement by Administrative Rule that an individual's psychiatric condition pose a significant danger to herself or others before she is entitled to reimbursement for inpatient

16

psychiatric care engrafts an additional requirement on its enabling statute. That additional requirement is, therefore, without effect.

There is considerable cause for concern that had the hearing examiner, the District Court, and the majority of this Court not focused completely on the administrative requirement of "significant danger," and instead, focused simply on the statutory requirement that hospitalization be "medically necessary," the outcome in this case may have been different.

I note, for example, that the hearing examiner found that, prior to her hospitalization, D.B.B. had digressed into fantasy and was having nightmares; sexually acted out at school with her friends; was observed on the playground trying to call up the devil; and had been followed in out-patient therapy for the previous two years. As a result of sexual abuse by her uncle and emotional abuse by her father, she was diagnosed as suffering from post-traumatic stress disorder. Three mental health professionals recommended that she be placed in inpatient treatment. At the time that SRS concluded that hospitalization was no longer medically necessary, D.B.B. was being treated for anger, depression, and oppositional behavior. She had frequent mood swings, decreased self-esteem, felt overwhelmed by her environment, and she felt worthless, helpless, and hopeless. She suffered from flashbacks and disruptive recollections of past events of sexual abuse, she experienced dissociative episodes, outbursts of anger and

17

aggression, marked difficulty concentrating, play themes consisting of violence, avoided dealing with feelings, was unable to express feelings openly, and she was overly anxious.

Those health care providers from Shodair who treated D.B.B. testified, according to the hearings examiner:

> [H]ow critical it was that [D.B.B.] have a continuity of care with time for relationships of trust and confidence to develop. Shodair provides it would have been counterproductive to have allowed [D.B.B.] to stay at Shodair only two weeks and then transfer her to a residential treatment facility.

The hearing examiner also agreed with Shodair that:

> [U]nlike MHMA reviewers or Dr. Osborne, the Shodair staff dealt directly with [D.B.B.] and, therefore, knows a good deal more about the child than the MHMA reviewers. . . .

Finally, the following entries from D.B.B.'s medical records made during the period in question suggest that, at a minimum, continued inpatient treatment was "medically necessary":

> 08/29 During play therapy DBB played with puppets and a baby doll. The puppets tucked the baby in bed, but one puppet made too much noise and woke the baby. The puppet then had to be killed and was buried in the sand and left there. Shodair Exhibit I, entry for 8/29. Cheryl Ronish, DBB's primary therapist and a master's degree social worker, testified that: "[A] violent theme ran through all of [DBB's] play. Often she would be the victim and then she would switch to be the victimizer, people were hurt, usually the puppets or her. . . ." Hearing Transcript, p. 309.

> 08/31 During activities therapy, DBB continued to exhibit swings in mood. She was having difficulty with her feelings, but was unable to put words to those feelings. DBB needed redirection in all areas and discontinued activities after participating for only a few minutes. Shodair Exhibit J, entry for 8/31. On the same day DBB expressed anger and used foul language with the nursing staff. DBB stated she did not want to go home and stated that she feared she would kill someone if

18

she returned home. DBB told the nursing staff, "I've killed people, the police and everyone know what I've done." DBB was given a pillow and allowed to use the quiet room to discharge her anger. She hit the pillow against the wall and was observed kicking the wall and head butting the wall. Dr. Larson, DBB's child psychiatrist, testified at the hearing that Shodair considered this to be "very dangerous behavior." Hearing Transcript, p. 203. DBB was then taken to the punching bag where she "wailed on it." The child care worker noted that DBB had homicidal fears and appeared to have delusional thinking. Shodair Exhibit G, entry for 8/31.

09/03    During the evening of 9/3 DBB said she was on suicide precautions for biting herself. She hit a peer, then started talking about "wanting to kill somebody, anybody. I've done it and will do it again, my dad even knows." Shodair Exhibit G, entry for 9/3.

09/06    The weekly treatment plan review for 9/6, which is a part of Shodair Exhibit J, states that DBB was "still unable to express anger appropriately and has a potential to hurt others." It also noted that DBB talked "a lot about violence."

09/07    DBB stated that she wanted to be placed on suicide precautions, and would do it by biting and hitting herself. She was talking with her peers about how the Indians had killed the white man in her town. Shodair Exhibit G, entry for 9/7.

09/14    During activities therapy DBB continued to have great variations in mood, and her moods could change within a single activity. There appeared to be no way of predicting when this was going to happen. DBB continued to close herself down when overwhelmed by her feelings, and refused to speak to staff at such times. DBB had particular difficulty while playing miniature golf. She appeared to be very preoccupied and needed constant redirection from staff, which she did not easily accept. At times staff had to physically intervene in order to get DBB back on task, and when DBB was touched she would become very hostile. Shodair Exhibit K, entry for 9/14. [The activities therapist] testified as follows about this incident:

> . . . we were playing miniature golf at Mr. T's and DBB was having a very difficult time attending to the activity. There was one instance where when I tried to call her back to that activity there was

19

> absolutely no response from her, she had her back to me and it was as if she didn't hear anything I was saying. I called her name four times, she still didn't respond, I finally had to touch her and then she was very hostile toward me at that point. A lot of just this verbal barrage came at me and this extremely fearful reaction in her entire body posturing that looked as if she could strike out at any minute. She did not reveal anything at that point in time and did not seem able to talk right then but it was on that same day that she spoke about the dad possibly beating the shit out of her if she indeed talked about things that had happened to her. So it looked like this was a time when she is reflecting on a lot of what's happened to her. Possibly having flashbacks and fortunately is able to begin disclosing some of what's happening to her. Hearing Transcript, pp. 355-56.

The problem with the result in this case is that none of these facts have been analyzed in terms of whether they made continuing hospitalization "medically necessary" without the additional requirement of proving medical necessity by establishing significant danger according to the department's policy guidelines which were at best indecipherable and at worst a classic example of a bureaucratic mind run amok.

Lost in the shuffle of bureaucratic rules and guidelines was the only real consideration which was relevant in this case. That was whether D.B.B.'s continued hospitalization was medically necessary. Her treating physicians said, "Yes." Her records would indicate that it was. Yet that question was never answered.

For these reasons, I would reverse and vacate the decision of the hearing examiner based on an incorrect application of the law to the facts in this case and remand for further consideration

20

based on the correct criteria for medicaid reimbursement which is set forth at § 53-6-101(6), MCA.

_____
Justice

Justice William E. Hunt, Sr., joins in the foregoing dissenting opinion.

_____
Justice

Justice James C. Nelson specially concurs.

I have signed the opinion in this case because our analysis and decision is correct *on the issues as raised* in the administrative proceedings, as reviewed by the District Court and as presented and argued to this Court on appeal.

That is not to say, however, that I disagree with the substance of Justice Trieweiler's dissent or with his analysis of ARM 46.12.590 (1990), vis-a-vis § 53-6-101, MCA, at issue here. Rather, my decision in the instant case is dictated by the oft-repeated principle that we will not address or determine arguments, issues or theories unless first presented in the appropriate lower tribunals and then preserved for decision by this Court on appeal. Farley v. Booth Bros. Land & Livestock Co. (1995), 890 P.2d 377, 381, 52 St.Rep. 46, 49, (citing Goodover v. Lindey's Inc. (1992), 255 Mont. 430, 441, 843 P.2d 765, 772.)

_____
                        Justice

22